# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ELIN WARN BETANZO,

       Plaintiff,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and LEE
ZELDIN, Administrator, United States
Environmental Protection Agency

       Defendants.

_____/

Case No.

Hon.

| | |
|---|---|
| Michael J. Steinberg (P43085) | Christopher Marchesano |
| Dana Chen* | (N.Y. Bar No. 5152681) |
| Skylar Parpan* | Jacob Metz-Lerman |
| Sarah De Falco* | (N.Y. Bar No. 6168272)** |
| Civil Rights Litigation Initiative | Climate Science Legal |
| University of Michigan Law School | Defense Fund |
| 701 S. State St., Suite 2020 | 475 Riverside Dr., Suite 246 |
| Ann Arbor, MI 48109 | New York, NY 10115 |
| (734) 763-1983 | (646) 801-0853 |
| mjsteinb@umich.edu | cmarchesano@csldf.org |
| danachen@umich.edu | jmetzlerman@csldf.org |

Counsel for Plaintiff

* Student Attorney practicing pursuant to
Local Rule 83.21

**Application for Admission Pending
_____/

## COMPLAINT

## INTRODUCTION

1.      The right to criticize our government and expose government wrongdoing is foundational to our democracy. But this right is meaningless if the government can freely punish dissent. The Environmental Protection Agency (EPA) fired Ms. Warn Betanzo for signing a petition protesting what she reasonably saw as dangerous, abusive, and illegal actions taken by the agency. This lawsuit challenges Ms. Warn Betanzo's illegal and unconstitutional dismissal and the government's "zero-tolerance" policy for dissent that prompted her dismissal.

2.      Ms. Warn Betanzo is an accomplished and well-respected drinking water expert who has served the public for more than two decades. Before her dismissal, she was serving a three-year term as a member of the National Drinking Water Advisory Council (NDWAC), a federal advisory committee that provides critical guidance to the EPA on drinking water policy. In this capacity, she worked part-time as a Special Government Employee while continuing to serve the broader public as the founder and president of Safe Water Engineering LLC.

3.      In July 2025, Ms. Warn Betanzo signed a petition that criticized the EPA for disregarding scientific expertise, publishing misinformation, dismantling key offices, and "promoting a culture of fear" among EPA employees. The petition warned that these agency actions posed a threat to public health and that some might be illegal. Ms. Warn Betanzo signed this petition, referred to as the EPA

2

Declaration of Dissent ("EPA Declaration"), out of a sense of duty to the American people. She felt she had to speak up.

4.     The EPA quickly moved to suspend Ms. Warn Betanzo and all other EPA employees who had signed the petition. An EPA official informed Ms. Warn Betanzo by email that the agency had initiated an investigation into her petition signature and that she must cease all work for the EPA. The agency suspended approximately 144 employees for signing the petition.

5.     The same day as these mass suspensions, the EPA released a statement attacking the employees who had signed the petition. The agency declared it "has a zero-tolerance policy for career bureaucrats unlawfully undermining, sabotaging, and undercutting the administration's agenda."

6.     Defendant Lee Zeldin, Administrator of the EPA, publicly accused the employees of writing the petition "as agency employees, using their official work title." He further affirmed "Our ZERO tolerance policy is in full force and effect and will be unapologetically implemented unconditionally."

7.     The EPA publicly condemned the employees before any investigation had been conducted. No investigation had concluded the employees had acted "unlawfully" or "as agency employees." In fact, agency lawyers had expressly concluded otherwise. They told EPA leadership that the employees had not violated any ethics rule and warned that "taking any [retaliatory] action would

3

present significant legal risk, as the [EPA Declaration] is likely protected speech under the First Amendment."

8. EPA officials' response to the Declaration showed open disdain for the law and United States Constitution. Their response was clearly intended to intimidate employees into silence by making an example of the petition signatories. Everyone understood the "zero tolerance" policy: employees will be punished for any public criticism of administration leadership.

9. Over the next six months, Defendants refused to provide Ms. Warn Betanzo with any information about the investigation, despite her repeated inquiries. Defendants gave no indication that they actually carried out an investigation. They did not interview Ms. Warn Betanzo or provide her with any form of process.

10. Indeed, the EPA's public statements and internal emails show that any "investigation" was a foregone conclusion. Officials intended to punish Ms. Warn Betanzo and the other petition signatories before any investigation, and before agency lawyers even told them such punishment was likely unconstitutional.

11. On January 21, 2026, Defendants sent Ms. Warn Betanzo a letter dismissing her from NDWAC. Ms. Warn Betanzo was barely a year into her three-year term.

4

12.     Defendants violated Ms. Warn Betanzo's First Amendment rights by suspending and subsequently dismissing her from NDWAC because she publicly criticized EPA leadership.

13.     Ms. Warn Betanzo's suspension and dismissal also violated the Administrative Procedure Act (APA) because these actions were arbitrary, capricious, and unconstitutional; the Federal Advisory Committee Act (FACA) because her suspension and dismissal undermined the independent, fairly balanced nature of NDWAC; and the Whistleblower Protection Act (WPA) because Ms. Warn Betanzo's speech was a protected disclosure of what she reasonably believed was government wrongdoing.

14.     Furthermore, the EPA's "zero tolerance" policy for dissent continues to violate the First Amendment by chilling protected speech. The policy violates the APA because it is arbitrary and capricious, undermines the independence of NDWAC, and discourages protected whistleblowing under the WPA.

15.     Ms. Warn Betanzo seeks a declaration stating that: 1) that her suspension and removal violated federal law and the First Amendment; and 2) that the EPA's "zero tolerance" policy violates federal law and the First Amendment. She further asks this Court to order Defendants to: 1) reinstate her to her position on NDWAC; 2) clear her personnel file of any disciplinary records relating to her signature on the EPA Declaration; 3) pay her for lost wages; and 4) enjoin the

EPA's "zero tolerance" policy for dissent and publicize the reversal of this policy within the agency. Lastly, Ms. Warn Betanzo seeks damages and other appropriate relief.

## JURISDICTION AND VENUE

16.    Ms. Warn Betanzo brings this case under the First Amendment to the United States Constitution, as well as under the Administrative Procedure Act. This Court has subject matter jurisdiction and is authorized to grant Ms. Warn Betanzo relief pursuant to 28 U.S.C. §§ 1331 and 1343.

17.    Ms. Warn Betanzo's claim for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202; by Rules 57 and 65 of the Federal Rules of Civil Procedure; and by the general legal and equitable powers of this Court.

18.    Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391(b)(2) and (e)(1). Plaintiff resides in this district, a substantial part of the events giving rise to this claim occurred in this district, and Defendant Zeldin is an officer of the United States sued in his official capacity.

## PARTIES

19.    Plaintiff Elin Warn Betanzo is a resident of Michigan and a drinking water expert who served on NDWAC from 2021 until her removal in 2025.

6

20.     Defendant United States Environmental Protection Agency (EPA) has an office in Ann Arbor, Michigan and is the federal agency under which NDWAC falls.

21.     Defendant Lee Zeldin is the Administrator of the EPA. Administrator Zeldin is charged with appointing members to NDWAC.

### STATEMENT OF FACTS

### Ms. Warn Betanzo's Public Service

22.     Ms. Warn Betanzo is an engineer and national drinking water expert. She has spent more than two decades working to ensure that everyone in the U.S. has access to safe drinking water.

23.     Ms. Warn Betanzo began working for the EPA shortly after graduating college with a degree in environmental science. She first served as a specialist in the Office of the Chief Financial Officer. In 2002, she joined the EPA's Office of Ground Water and Drinking Water as an environmental engineer. In this role, she made important contributions to drinking water regulations, authored guidance for state water authorities, and supported the agency's response to the Washington, D.C. lead crisis in 2004.  She later oversaw implementation of the SDWA as the EPA's National Tribal Drinking Water Coordinator.

24.     Ms. Warn Betanzo left the EPA in 2008 in good standing. She subsequently worked for a large water utility and the Northeast-Midwest Institute,

where she advised members of Congress on issues related to water quality and water infrastructure.

25.     In 2014, Ms. Warn Betanzo played a key role in helping to uncover the Flint water crisis. Alarmed by early signals of lead poisoning in Flint, Ms. Warn Betanzo encouraged Dr. Mona Hanna, a Flint pediatrician, to conduct a study that uncovered high levels of lead in children in Flint. The results of the study forced officials to act on the crisis.

26.     Ms. Warn Betanzo founded Safe Water Engineering LLC in 2017. Her consulting firm advises communities, water utilities, and policymakers on drinking water policy and engineering.

27.     In 2021, Ms. Warn Betanzo was nominated to serve as a member of NDWAC, a statutorily mandated council that provides recommendations to the EPA on drinking water policy. NDWAC was established by the Safe Drinking Water Act (SDWA) of 1974 to "advise, consult with, and make recommendations" to the EPA on matters related to the agency's activities, policies, and functions under the Act. *See* 42 U.S.C. 300j-5(b). NDWAC is a federal advisory committee pursuant to FACA, 5 U.S.C. § 1001(2)(a).

28.     Federal advisory committees play a crucial role in ensuring that agencies engage with a variety of stakeholders, ranging from academics and local governments to non-profits and industry. Advisory committees serve as a "useful

8

and beneficial means of furnishing expert advice, ideas, and diverse opinions to the Federal Government." *See* 5 U.S.C. § 1002. Advisory committees do not merely provide a channel for public comment on agency regulations; they bring together subject matter experts to regularly engage with one another and with the work of the agency.

29.     Advisory committees solely provide advice to the government; they do not determine government policy. *See* 5 USCS § 1002(b)(6). They do not speak for the government or represent the agency's views. Instead, advisory committees make recommendations according their "independent judgment." *See* 5 U.S.C. § 1004(b)(3).

30.     According to its Charter, NDWAC provides "practical and independent advice," recommends policy changes, and identifies "emerging environmental or health problems" related to drinking water. This requires NDWAC members to criticize and dissent from EPA policies while serving in their official capacity.

31.     NDWAC has 15 seats, divided equally between state water officials, industry representatives, and members of the general public (or "community representatives"). As the president of a public interest firm, Ms. Warn Betanzo served as one of NDWAC's five community representatives. NDWAC members serve three-year terms that are staggered to ensure continuity on the council.

9

32.     NDWAC members are classified as Special Government Employees (SGEs), pursuant to 18 U.S.C. § 202(a). They work part-time, receiving modest pay for the time they spend in meetings and for their committee work.

33.     Serving as a member of NDWAC is prestigious. The role bolstered Ms. Warn Betanzo's reputation as a drinking water expert. It strengthened her credibility and legitimacy when interacting with clients and policymakers, as it showed that she was selected to be one of only a handful of advisors to the federal government. The credibility and prestige from this role helped her consulting business maintain and attract new clients, and it gave her advocacy added weight. The position also gave her networking opportunities by connecting her with other national drinking water experts who sat on the council.

34.     Being a NDWAC member also gave Ms. Warn Betanzo deep personal satisfaction, as she is passionate about ensuring that everyone in the U.S. has clean drinking water. Ms. Warn Betanzo valued the opportunity to provide policy recommendations to the EPA. She brought unique experience to the council which made her input particularly valuable on matters related to underfunded and rural water systems and on-the-ground implementation. Ms. Warn Betanzo valued the opportunity to shape the council's public record even if the EPA chose not to follow her recommendations.

10

35.     Ms. Warn Betanzo served a full three-year term on NDWAC from 2021 to 2024. During this time, Ms. Warn Betanzo worked on NDWAC's microbial and disinfection byproducts working group, where she helped draft a report with detailed recommendations for rule revisions and implementation.[1] Ms. Warn Betanzo proudly shares this report with clients and policymakers.

36.     During her time on NDWAC, Ms. Warn Betanzo received regular feedback from the EPA informing her that her involvement on the council was helpful and important. The sitting Chair of NDWAC, Elizabeth Corr, informed Ms. Warn Betanzo that the expertise she provided on the EPA's lead and copper rule was essential for moving forward with the rulemaking.

37.     In 2024, EPA officials informed Ms. Warn Betanzo that they valued her service and invited her back to NDWAC for a second three-year term, which she began in January 2025.

### **Ms. Warn Betanzo Signs a Petition Critical of EPA Leadership**

38.     On July 1, 2025, Ms. Warn Betanzo signed a petition called the EPA Declaration of Dissent, which was distributed by the science advocacy group Stand Up for Science. *See* Exhibit A (EPA Declaration).

---

[1] Nat'l Drinking Water Advisory Council, Report of the Microbial and Disinfection Byproducts Rule Revisions Working Group (Nov. 13, 2023), https://www.epa.gov/system/files/documents/2023-11/report-of-the-mdbp-rule-revisions-working-group-to-the-ndwac-november-2023_0.pdf.

39.     The EPA Declaration, addressed to Administrator Zeldin and members of Congress, registered opposition to "this administration's policies, including those that undermine the EPA mission of protecting human health and the environment."

40.     The EPA Declaration condemned:

a.  Recent agency decisions that contradicted the agency's own scientific assessments, thereby threatening the environment and public health;

b.  Press releases and other agency communications that provided misleading information about climate change and seemingly violated the Hatch Act prohibition on partisan activities;

c.  The agency's dismantling of its environmental justice program;

d.  The agency's dismantling of the Office of Research and Development, which, pursuant to 42 U.S.C. § 4363, leads research that is critical to the environment, public health and U.S. economy; and,

e.  The agency's promotion of a "culture of fear" in the workplace by nullifying bargaining agreements and firing or forcing onto administrative leave several categories of employees.

41.     The Declaration states that it was written by EPA employees "in our personal capacity, on our own time, and without Agency resources. We are devoted to EPA's mission: to protect human health and the environment."

42. The EPA Declaration did not conflict or interfere with Ms. Warn Betanzo's NDWAC duties. The contents of the petition did not discuss or relate to any of Ms. Warn Betanzo's colleagues or immediate supervisors; it was solely critical of decisions made by the agency's top leadership.

43. Ms. Warn Betanzo signed the EPA Declaration as a private citizen. She did not sign the petition while on NDWAC time or using EPA resources, and she did not use her NDWAC title. She signed the Declaration using her personal laptop and personal email address.

44. Hundreds of employees signed the Declaration anonymously because they feared retaliation.

### The EPA Enforces its "Zero Tolerance" Policy on Dissent by Suspending Ms. Warn Betanzo and Other Signatories

45. Shortly after the EPA Declaration was sent to Defendant Zeldin, EPA officials began working to identify the current employees who signed the petition. *See* Exhibit B (Email about identifying signatories). [2] Agency officials combed through the list of signatories and divided the names into different categories, including employees, unidentifiable names, staffers already removed from the agency, and "Union Representatives." *See* Exhibit C (Email about sorting

---

[2] Internal EPA emails were obtained under the Freedom of Information Act.

signatories). They continued to monitor the list of names as additional signatories joined the list. *See* Exhibit D (Email thread about new signatories).

46.    At the same time, EPA officials consulted with agency counsel about potential retaliation. The attorneys expressly advised EPA leadership against retaliation.

47.    On July 1, 2026, Justina Fugh, Senior Counsel for Ethics, wrote to a colleague:

> I was asked a similar question earlier today so looked at the petition (www.standupforscience.net). I responded by saying that there is nothing in this petition to raise any concerns under the Hatch Act, so the next question to Ethics was whether signing a petition, presumably on personal time, with reference generally to EPA position (for those who are still at EPA, even in administrative leave) presented any misuse of position concerns. I consulted with my team during our staff meeting, and they corroborated my initial reaction: the employees are simply exercising their first amendment rights to express their opinions. The petition states on its face that the employees are acting in their personal capacity and on their own time, so one cannot reasonably assume that they are intentionally misusing their federal positions to bolster their opinions.

Exhibit E (Emails regarding ethics advice).

48.    The next day, Ms. Fugh reiterated this analysis to another colleague:

> We've been asked this question twice already. My staff and I have looked at the petition (www.standupforscience.net ) and concluded that there is no ethics concern . . . Even those who identify themselves as current EPA employees (many are anonymous) do not present any misuse of position concerns. The employees are simply exercising their first amendment rights to express their opinions and, we conclude, are not intentionally misusing their federal positions to bolster their opinions.

14

*Id.*

49.    That same day, Nate Nichols, Assistant General Counsel in the

Employment Law Practice Group, provided similar analysis. In an email to agency

officials, he wrote:

> Elise checked with Justina and there are no ethics concerns with employees
> signing the [EPA Declaration] . . . my legal advice is that the agency should
> not take personnel actions against employees who signed the [EPA
> Declaration] or take any other action against them that may be viewed as
> retaliatory or that may have a chilling effect on other employees taking
> similar actions. Taking any such action would present significant legal risk,
> as the [EPA Declaration] is likely protected speech under the First
> Amendment.
>
> Under *Pickering v. Bd. Of Educ. Of Twp High Sch. Dist. 205,* 391 U.S. 563
> (1968) . . . government employee speech is protected under the First
> Amendment if the employee (1) speaks as a private citizen (and not on
> behalf of the agency), (2) about a matter of public concern, and (3) the
> speech does not interfere with the employee's job.
>
> Based on an initial read of the [Declaration], the signatories assert that it
> "was written and signed by EPA employees across Offices, Regions, and
> Labs in our personal capacity, on our own time, and without Agency
> resources." Assuming this is true, the document appears to meet the
> *Pickering* test and the Agency would be prohibited from retaliating against
> employees who signed the document. The document is unquestionably about
> matters of public concern . . . Additionally, courts have found that "where
> . . . an employee serves no confidential, policymaking, or public contact
> role, the danger to the agency's successful function from that employee's
> private speech is minimal." *Rankin v. McPherson*, 483 US. 378, 390 (1987).
>
> If the agency retaliates against the employee signatories, we should expect a
> litigation with significantly increased publicity surrounding the letter.

Exhibit F (Email thread regarding legal advice).

15

50.     Mr. Nichols' analysis was shared with several top EPA officials. He first sent his analysis to Krysti Wells, Director of the Office of Chief Human Capital Officer, at 3:12 p.m. on July 2, 2026. He also indicated that his analysis had been shared with David Fotouhi, EPA's Deputy Administrator, that afternoon.

51.     Michael Molina, another top official, forwarded Mr. Nichols' analysis to Travis Voyles, Associate Deputy Administrator, and Molly Vaseliou, Associate Administrator for Public Affairs, at 7:56 p.m. that same day. He only wrote "For Situational Awareness" in the body of his email, suggesting the decision to retaliate had already been made.

52.     Less than 24 hours later, at 1:33 p.m. on July 3, 2025, Ms. Warn Betanzo received an email from EPA Principal Deputy Assistant Administrator Peggy Browne stating that "EPA leadership is investigating your potential signature on a petition. As such, please cease all work for EPA. The Office of Water will not schedule you for any future working hours until after the investigation has concluded." *See* Exhibit G (Suspension email).

53.     Agency leadership suspended approximately 144 employees who signed the EPA Declaration.[3] This represents nearly all the signatories who could be identified as active EPA employees. Some union officials who signed the

---

[3] The EPA first stated that it had suspended 139 employees for signing the Declaration. Several sources reported later that day that the EPA had suspended 144 signatories. By mid-July the EPA said that it had suspended 160 signatories.

Declaration were briefly suspended, while others were never suspended in the first place. Commentators believed the EPA spared union representatives because punishing them would have strengthened the union's legal case.

54. One suspended employee reported that she was escorted out of the office by higher-level management.[4] The employee described feeling emotionally "wrecked" by this. Another suspended employee described being pulled into an emergency meeting where their superior said they had to read a script out loud to them. Their superior said they would be escorted out of the building if they were not out by 1 p.m.

55. Stand Up for Science quickly removed the list of signatories from its website in an effort to protect them from retaliation. But this did not deter agency officials. Internal emails from July 3, 2026, show that officials "recovered the names on the [Stand Up for Science] site" using the Wayback Machine, a website archive. *See* Exhibit H (Email thread about recovery of named signatories). Mr. Molina congratulated the official on recovering the names, to which she replied, "Glass is always half full." In a separate email, Mr. Molina wrote that he had "screen shots of every name on my phone." *See* Exhibit I (Second email thread

---

[4] Ella Nilsen & Rene Marsh, *EPA Suspends and Investigates Around 140 Employees Who Signed a Letter Critical of the Agency*, CNN (July 3, 2025), https://www.cnn.com/2025/07/03/climate/epa-letter-employees-suspended-investigation.

about recovery of named signatories). These emails show EPA officials'

determination to punish the Declaration signatories.

56. The EPA released a statement justifying its punitive response, stating

"The [EPA] has a zero-tolerance policy for career bureaucrats unlawfully

undermining, sabotaging, and undercutting the administration's agenda as voted

for by the great people of this country last November."[5]

57. Defendant Zeldin issued a similar statement announcing the EPA's

policy on dissent:

> We have a ZERO tolerance policy for agency bureaucrats unlawfully undermining, sabotaging, and undercutting the agenda of this administration as voted for by the great people of this country last November. The will of the American public will not be ignored at our agency. The vast majority of agency employees are dedicated to the core mission of protecting human health and the environment, Powering the Great American Comeback, and respecting the will of the American people. . . . it has been a high honor to . . . [partner with EPA employees] to implement the agenda our country voted for last year. Unfortunately, a small number of employees signed onto a public letter, written as agency employees, using their official work title, that was riddled with misinformation regarding agency business. Our ZERO tolerance policy is in full force and effect and will be unapologetically implemented unconditionally.

58. At the time of this statement, the EPA had not completed any

investigation into the preparation and signing of the Declaration.

---

[5] *Id.*

59.     In an email newsletter sent to staff that same day, Defendant Zeldin wrote "While some may attempt to thwart our core mission, publicly perpetuate misinformation regarding agency business, and ignore the will of the American people, so many have rolled up their sleeves to do the [EPA's] important work of protecting and improving access to clean air, land, and water for all Americans."

60.     Defendants' statements and actions directly contradicted the advice and analysis provided by agency attorneys. The EPA suspended the signatories mere hours after receiving some of this advice, showing no real consideration or reasoned assessment.

61.     On July 8, 2025, several members of Congress sent an open letter to Defendant Zeldin calling on the EPA to immediately return the suspended employees. They wrote:

> It is deeply disturbing to see you blatantly break the law while baselessly accusing others of misconduct. Your retaliation against these signatory-whistleblowers is plainly illegal. . . . an EPA spokesperson declared "a zero-tolerance policy for career bureaucrats unlawfully undermining, sabotaging, and undercutting the administration's agenda," effectively concluding and publicly announcing that these individuals had somehow violated the law before an investigation was even conducted. Taking adverse actions against employees for making a protected disclosure—including investigating them and placing them on administrative leave—in a manner that deters others from coming forward is a textbook violation of the Whistleblower Protection Act . . . You must stop abusing your office and return these employees to their regular status immediately.

*See* Exhibit J (First Congressional Letter to Zeldin) (citations omitted).

19

62.     Over a hundred Congress members signed a subsequent letter that expressed deep concern "that placing these [signatories] on administrative leave was a violation of their First Amendment rights." *See* Exhibit K (Second Congressional Letter to Zeldin). The letter asked the EPA to cease its investigation and "immediately reinstate" the suspended employees.

63.     Employees understood the EPA's "zero tolerance" policy was meant to intimidate them into silence. For example, one suspended employee told reporters, "they are trying to scare us."[6] Current employees also told reporters:

    a.  "The message that sends to the federal workforce is hard to miss. Agree with us, or we are coming for you;"

    b.  "They want us to be scared. They want us to shut up and sit down. It's basic free speech;"

    c.   "This retaliation against us employees is having a real chilling effect on us. The retribution against any dissent is stifling important conversations about the science and process to protect public health and the environment."

64.     Ms. Warn Betanzo also initially felt chilled by the "zero tolerance" policy. After the EPA suspended her, she hesitated to speak out or make a public comment condemning the EPA's proposed rule loosening restrictions on per- and

---

[6] *Id.*

polyfluoroalkyl substances (PFAS) in drinking water. Ms. Warn Betanzo thought the EPA might allow her to return to service if she stayed quiet. She consulted friends and colleagues who told her there was no chance administration officials would allow her to rejoin NDWAC. Believing there was likely nothing more she could lose, Ms. Warn Betanzo decided to speak out against her suspension and the EPA's proposed rollback of PFAS regulations.

65. The EPA's "zero tolerance" policy even caused employees of other agencies to limit their speech. Employees at the National Science Foundation (NSF) had planned to release their own petition on July 14, 2025; however, they placed the petition on "indefinite hold" after the EPA crackdown on Declaration signatories.[7] Union leaders reportedly "decided not to move forward with the declaration out of fear of retaliation like what happened at the EPA."[8] A leaked version of this petition shows that it similarly criticized NSF leadership for actions that undermined the agency's mission to promote science, health, and U.S. prosperity, including actions that "ignored multiple bipartisan laws."[9]

---

[7] Rebecca Trager, *National Science Foundation Employees' Dissent Declaration On 'Indefinite Hold,'* Chemistry World (July 15, 2025), https://www.chemistryworld.com/news/national-science-foundation-employees-dissent-declaration-on-indefinite-hold/4021854.article.
[8] Walker Bragman, *National Science Foundation Workers to Issue "Alexandria Declaration" Decrying "Catastrophic Changes" Under Trump Administration*, Important Context (July 9, 2025), https://www.importantcontext.news/p/national-science-foundation-workers.
[9] *Id.*

66.     In August 2025, approximately 190 current and former employees at the U.S. Federal Emergency Management Agency (FEMA) signed the Katrina Declaration, a similar petition directed at FEMA officials.[10] Only 36 individuals signed with their names. FEMA officials quickly suspended the named individuals who still worked at the agency and kept them on paid leave for approximately eight months. The EPA's harsh response to the EPA Declaration a month earlier likely intimidated FEMA employees into not signing the Katrina Declaration or signing anonymously.

67.     A survey of over 11,000 federal employees, taken by Partnership for Public Service between November 10, 2025 and December 19, 2025, shows that employees have become far more fearful of retaliation. Just 22.5% of surveyed employees said they were confident they could "report a suspected violation of a law, rule or regulation without experiencing retaliation," compared to 71.9% of respondents in a similar 2024 survey. Notably, only 3.5% of surveyed EPA employees felt confident they could report suspected violations without suffering retaliation. This was the lowest percentage of any agency, aside from the Consumer Financial Protection Bureau. The EPA's "zero tolerance" policy had

---

[10] Gabrielle Canon, *FEMA Employees Who Criticized Trump Cuts Reinstated After Months on Leave*, The Guardian (Apr. 30, 2026, at 21:01 ET), https://www.theguardian.com/us-news/2026/apr/30/fema-letter-katrina-declaration.

worked— employees no longer feel free to dissent or even blow the whistle on government wrongdoing.

68.     Following her suspension, Ms. Warn Betanzo repeatedly requested more information on the status of the investigation but received no further information. *See* Exhibit L (Follow-up emails regarding investigation).

69.     Nobody from the EPA ever interviewed Ms. Warn Betanzo as part of the investigation.

70.     The EPA reportedly conducted an internal investigation by searching the computers and email accounts of employees who signed the Declaration.

71.     Some employees were also required to fill out a survey asking if they viewed the Declaration while on duty or used government resources to view or sign the document. In an email asking suspended employees to fill out the survey, the EPA threatened, "Failure to comply with this instruction and participate in this investigation and/or any lack of candor in your responses may result in discipline up to and including removal from the federal service." The survey shows the EPA's attempt to find a justification for further punishment.

72.     NDWAC held a public meeting on July 28, 2025, to provide recommendations for the agency's proposed rollback of the PFAS National Drinking Water Regulation. The meeting was required under the SDWA, 42 U.S.C. § 300j-5(b).

73. Ms. Warn Betanzo was not allowed to participate in the meeting as a NDWAC member. She asked to give oral comment as a member of the general public, but NDWAC placed her on a short waitlist of speakers. Ms. Warn Betanzo had initially hesitated to make this request, fearing her comments could hurt her chances of being restored to the Council. This hesitation likely cost her the opportunity to speak. Ms. Warn Betanzo was upset and disappointed to be excluded from the meeting, as she feels strongly about reducing PFAS pollution in our drinking water.

74. Ms. Warn Betanzo was placed on indefinite suspension without pay. Ms. Warn Betanzo was kept in limbo, with no information, for six months. This placed an emotional burden on Ms. Warn Betanzo.

### The EPA Fires Ms. Warn Betanzo and Other Declaration Signatories

75. On January 21, 2026, Principal Deputy Assistant Administrator Browne sent a letter to Ms. Warn Betanzo informing her that "the agency has determined to reset membership [of NDWAC], and effective immediately, your services are no longer needed at this time." *See* Exhibit M (Dismissal Letter).

76. Ms. Warn Betanzo was the only NDWAC member removed before the end of her term. The EPA have not removed another NDWAC member before the end of their term since at least 2000.

77.     The EPA also punished other signatories after keeping them on extended leave. Some received letters of reprimand, while others were suspended without pay for two weeks. The EPA fired at least 17 other employees for signing the EPA Declaration.[11] The EPA charged these employees with "Conduct Unbecoming of a Federal Employee" because officials could not find more precise violations, such as misuse of agency resources.

78.     EPA officials always intended to punish Ms. Warn Betanzo and other Declaration signatories. They disregarded legal analysis that cautioned against retaliation. They wrote internal emails celebrating their hunt for employees who signed the Declaration. And they attacked the signatories in the media, declaring their guilt before conducting an investigation.

79.     The decision to dismiss Ms. Warn Betanzo was not reached through a fair, reasoned process.

80.     The EPA's punishment of Declaration signatories reflects a clear pattern of retaliation. The agency imposed unusually harsh penalties for the claimed offense, using loopholes to minimize legal exposure. In many cases, the EPA retaliated with actions that are not appealable to the Merit Systems Protection

---

[11] Drew Friedman, *Fired EPA Employees Challenge Agency, Alleging Free Speech Violations*, Fed. News Network (Dec. 3, 2025, at 18:11 ET), https://federalnewsnetwork.com/workforce-rightsgovernance/2025/12/fired-epa-employees-challenge-agency-alleging-free-speech-violations/.

Board (MSPB), thereby limiting litigation and independent scrutiny. The EPA also adopted *post hoc* rationales to justify its retaliation.

81.     EPA officials acted with a sense of impunity, knowing that the Office of Special Counsel (OSC)—which is tasked with investigating prohibited personnel practices—has lost its statutorily mandated independence. In February 2025, President Trump fired Special Counsel Dellinger without cause because he had taken steps to oppose the Administration's mass firings of probationary employees. President Trump appointed his Trade Representative, Jamieson Greer, as Acting Special Counsel. Shortly after assuming control of OSC, Mr. Greer prohibited OSC staff from communicating with other federal agencies regarding the mass firings. Less than a week later, the OSC reversed course on its investigations of the mass firings.

82.     Since then, the OSC has continued to selectively exercise its mandate by aligning itself with Administration policies. The OSC launched an investigation into the former special counsel who led criminal investigations into President Trump; changed guidance to allow display of campaign materials associated with President Trump; and adopted a policy of reporting violations of the Hatch Act to the President rather than pursuing disciplinary actions before the MSPB. Mr. Greer continues to serve as the U.S. Trade Representative, meaning he leads an office that he is also tasked with independently overseeing as Acting Special Counsel.

Current OSC staff, whistleblower organizations, and members of Congress have expressed alarm over the OSC's partisan decision-making. Since the firing of Special Counsel Dellinger, the OSC has not operated with independence and has not taken any action that conflicts with Administration policies or leadership.

83.   Since December 2025, dozens of petition signatories have complained to the OSC. But the OSC has given no indication that it is actively investigating the complaints.

84.   Ms. Warn Betanzo's seat on NDWAC continues to sit empty, four months after her dismissal. Ms. Warn Betanzo applied to rejoin NDWAC but she believes the "zero tolerance" policy will prevent the EPA from seriously considering her reappointment.

85.   Since first announcing the "zero tolerance" policy on July 3, 2025, the EPA has repeatedly reiterated that the policy is still in effect.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF THE FIRST AMENDMENT – RETALIATION FOR PROTECTED SPEECH

86.   Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

87. The First Amendment to the United States Constitution affords all persons the right to freedom of speech. Public employees do not lose this right "by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

88. The Supreme Court has repeatedly held that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *See Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018).

89. Ms. Warn Betanzo's signature on the Declaration was unquestionably protected speech. She spoke as a private citizen on matters of public concern.

90. Defendants violated Plaintiff's First Amendment rights by suspending and subsequently removing Plaintiff from her position on NDWAC in retaliation for her public criticism of EPA leadership.

91. Defendants' First Amendment violations have caused Plaintiff ongoing and irreparable harm.

## COUNT II

### VIOLATION OF THE FIRST AMENDMENT – VIEWPOINT DISCRIMINATION

92. Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

93. Viewpoint discrimination is one of the most serious threats to the First Amendment. "When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the

28

more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) (citations omitted).

94. Defendants justified their retaliation by pointing to the particular views expressed in the Declaration. The EPA accused the signatories of "undermining, sabotaging, and undercutting the administration's agenda as voted for by the great people of this country last November," explicitly referencing the political views at issue in the last election. In other words, the signatories were punished for publicly opposing the Administration's views.

95. Furthermore, the "zero tolerance" policy is expressly limited to dissenting viewpoints. It distinguishes between acceptable and unacceptable speech based on the views expressed.

96. Plaintiff's suspension and removal, pursuant to the EPA's "zero tolerance" policy for dissent, violated the First Amendment prohibition on viewpoint discrimination.

97. Defendants' First Amendment violations have caused Plaintiff ongoing and irreparable harm.

## COUNT III

### VIOLATION OF THE FIRST AMENDMENT –
### RIGHT TO PETITION THE GOVERNMENT

98.    Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

99.    The First Amendment protects the right to "petition the Government for a redress of grievances." U.S. Const. amend. I.

100.   The Drafters of the Bill of Rights understood that the right to petition was such an important form of expression it deserved distinct protection under the First Amendment.

101.   Plaintiff's suspension and removal for signing a petition directed at the government violated the Petitions Clause of the First Amendment.

102.   The "zero tolerance" policy violates the Petitions Clause by forbidding dissent. Under the "unconditional" policy, EPA employees may not petition their government with dissenting views. The right to petition inherently protects such dissent.

103.   Defendants' First Amendment violations have caused Plaintiff ongoing and irreparable harm.

## COUNT IV

## VIOLATION OF THE FIRST AMENDMENT – OVERBREADTH

104.   Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

105.   The First Amendment's overbreadth doctrine protects against laws, regulations, and policies that are so broad as to include, and thereby chill, protected speech.

106.   The "zero tolerance" policy was precisely designed to chill speech. The policy does not tolerate any criticism of the administration's agenda, regardless of whether the speech is constitutionally protected. Defendants intended to scare EPA employees with its aggressive and public demonstration of the policy. The policy has intimidated an untold number of employees, including employees at NSF, into silence.

107.   The "zero tolerance" policy violates the First Amendment prohibition on overbreadth as it substantially chills protected speech.

108.   Defendants' First Amendment violations have caused Plaintiff, EPA employees, employees of other agencies, and the American public ongoing and irreparable harm.

31

## COUNT V

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

109.   Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

110.   The Administrative Procedure Act (APA) authorizes the federal courts to hold unlawful and set aside agency action that is: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

111.   Defendants suspended Plaintiff despite receiving advice from government attorneys that retaliating against her would be unconstitutional. Defendants publicly condemned Plaintiff and other Declaration signatories before conducting an investigation. Defendants did not conduct a fair, unbiased investigation of Plaintiff's signature on the Declaration. Defendants consistently sought to advance their desired retaliatory outcome, openly disregarding constitutional and statutory law.

112.   Defendants' suspension and removal of Plaintiff because she signed a public petition critical of EPA leadership was arbitrary and capricious, an abuse of discretion, not in accordance with law, contrary to constitutional right and power, and in excess of statutory authority.

32

113.   Defendants' suspension and removal of Plaintiff is a final agency action under 5 U.S.C. § 704. These actions marked the consummation of the EPA's decision-making process, determined rights and obligations, and created legal consequences.

114.   The "zero tolerance" policy on dissent is applied "unapologetically" and "unconditionally" with no regard for the law, Constitution, or individual circumstances.

115.   Defendants' "zero tolerance" policy on dissent is arbitrary and capricious, not in accordance with law, contrary to constitutional right and power, and in excess of statutory authority.

116.   The "zero tolerance" policy is a final agency action. The policy is the consummation of the EPA's process on this matter. Defendants have repeatedly stated that the policy is being implemented and enforced against EPA employees. The policy has determined rights and obligations and created legal consequences because Plaintiff and other EPA employees were expressly suspended and removed, or otherwise punished, pursuant to the policy.

117.   Defendants' APA violations have caused Plaintiff ongoing and irreparable harm.

## COUNT VI

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AND THE FEDERAL ADVISORY COMMITTEE ACT

118.    Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

119.    NDWAC is a "federal advisory committee" within the meaning of FACA, 5 U.S.C. App. 2 § 1 *et seq.*

120.    FACA provides that advisory committees recommendations must "not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." 5 U.S.C. § 1004(b)(3). Committees should be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. § 1004(b)(2). These requirements "shall be followed by the President, agency heads, or other Federal officials in creating an advisory committee." 5 U.S.C. § 1004(c).

121.    The Safe Drinking Water Act (SDWA) requires that NDWAC be balanced between representatives of state and local authorities, private organizations, and members of the general public. *See* 42 U.S.C. 300j-5(a).

122.    Defendants' dismissal of Plaintiff violates FACA by inappropriately influencing the advice of NDWAC members. To fulfill their role as independent advisors, committee members must be free to criticize agency leadership and

34

decisions. This is a core element of their jobs. Punishing members for speech that is critical of EPA leadership sends an unmistakable message that such criticism will not be tolerated, thereby chilling criticism of agency decision-making. Defendants' decision to remove Plaintiff will cause other NDWAC members to avoid expressing views that the SDWA and FACA seek to elicit.

123. This chilling effect is made worse by the fact that Plaintiff's speech was made in her personal capacity, showing that agency leadership will not even tolerate off-duty criticism.

124. Defendants' dismissal of Plaintiff also violates FACA and the SDWA by creating an unfair balance of views on NDWAC. Defendants removed a critical voice on the committee and chilled the speech of other members, thereby improperly tilting the balance of the committee toward speech that is favorable to EPA leadership. By removing a community representative before the end of her term, Defendants upset NDWAC's statutorily mandated balance of representatives.

125. The APA prohibits agency actions that violate federal law or otherwise exceed the agency's statutory authority. 5 U.S.C. § 706(a), (c).

126. Defendants' removal of Plaintiff from NDWAC was therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" because it impermissibly influenced NDWAC and undermined its fair balance of views.

127.   Defendants' violations of the APA, FACA, and SDWA have caused Plaintiff ongoing and irreparable harm.

## COUNT VII

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AND WHISTLEBLOWER PROTECTION ACT**

128.   Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

129.   The WPA forbids retaliation against government employees for "any disclosure of information . . . which the employee . . . reasonably believes evidences— (i) any violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." *See* 5 U.S.C. § 2302(8)(a). This includes disclosures that "revealed information that had been previously disclosed." 5 U.S.C. § 2302(f)(1)(b).

130.   Defendants violated the WPA by punishing Plaintiff for engaging in a protected disclosure under 5 U.S.C. § 2302(8)(a). In signing the EPA Declaration, Plaintiff alleged gross mismanagement by agency leadership, abuses of authority, violations of the Hatch Act, and serious threats to public health posed by the rollback of agency regulations. Plaintiff held a reasonable belief that the disclosed information evidenced serious wrongdoing.

36

131.   Defendants' "zero tolerance" policy for dissent violates the WPA by intimidating would-be whistleblowers into silence. The policy signals that Defendants will do anything they can to retaliate against dissenting whistleblowers, even if such actions are unlawful. The policy threatens immediate retaliation— including indefinite suspension and condemnation in the media— that cannot or will not be repaired by eventual relief under the WPA. By threatening whistleblowers with irreparable harm, the policy circumvents and undermines WPA protections.

132.   The APA prohibits agency actions that violate federal law or otherwise exceed the agency's statutory authority. 5 U.S.C. § 706(a), (c).

133.   By violating the WPA, Defendants' suspension and dismissal of Plaintiff was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."

134.   Defendants' WPA violations have caused Plaintiff, EPA employees, employees of other agencies, and the American public ongoing and irreparable harm.

### RELIEF REQUESTED

135.   WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief against Defendants:

37

A. Enter a judgment declaring that Defendants' suspension and dismissal of Plaintiff from her position on NDWAC constituted a violation of the First Amendment and was arbitrary, capricious, and otherwise in violation of the law;

B. Enter a judgment declaring that Defendants' "zero tolerance" policy violates the First Amendment and is arbitrary, capricious, and otherwise in violation of the law;

C. Issue a preliminary injunction ordering Defendants to reinstate Plaintiff to her position on NDWAC for the remainder of her term and cease implementation of the "zero tolerance" policy on dissent;

D. Issue a permanent injunction ordering Defendants to reinstate Plaintiff to her position on NDWAC for the remainder of her term;

E. Issue a permanent injunction ordering Defendants to clear Plaintiff's personnel file of any disciplinary records relating to Defendants' investigation into her signature on the EPA Declaration;

F. Issue a permanent injunction 1) restraining Defendants from implementing the "zero-tolerance" policy of retaliation against employees who criticize administration leadership or policies as private citizens, and 2) ordering Defendants to publicize the reversal

38

of this policy within the EPA along with a clear statement of employees' rights under the First Amendment and WPA;

G. Issue a permanent injunction ordering Defendants to award Plaintiff pay she lost as a result of her suspension and removal;

H. Award damages and appropriate relief to Plaintiff against Defendants including but not limited to:

    a. Damages for loss of reputation and emotional distress; or, in the alternative,

    b. Nominal damages to Plaintiff;

I. Award costs and attorney's fees; and

J. Grant such other and additional relief that the Court finds just and appropriate under the circumstances.

Respectfully submitted,

/s/Michael J. Steinberg
Michael J. Steinberg (P43085)
Dana Chen*
Skylar Parpan*
Sarah De Falco*
Civil Rights Litigation Initiative
University of Michigan Law School
701 S. State St., Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu
danachen@umich.edu

Christopher Marchesano (N.Y. Bar No. 5152681)
Jacob Metz-Lerman (N.Y. Bar No. 6168272)**
Climate Science Legal Defense Fund
475 Riverside Dr., Suite 246
New York, NY 10115
(646) 801-0853
cmarchesano@csldf.org
jmetzlerman@csldf.org


*Counsel for Plaintiff*

* Student Attorney practicing pursuant to
Local Rule 83.21

**Application for Admission Pending

Dated:

40